2001 UT App 190

**MEADOW VALLEY CONTRACTORS, INC., Plaintiff and Appellee,**

v.

**TRANSCONTINENTAL INSURANCE COMPANY, Defendant and Appellant.**

No. 20000262–CA.

Court of Appeals of Utah.

June 14, 2001.

Scott W. Christensen and Jason M. Kerr, PLANT, WALLACE, CHRISTENSEN & Kanell, Salt Lake City, for Defendant and Appellant.

Jay E. Jensen and Scott T. Evans, Christensen & Jensen, P.C., Salt Lake City, for Plaintiff and Appellee.

Before GREENWOOD, P.J., and BENCH, and DAVIS, JJ.

## OPINION

BENCH, Judge:

¶ 1 Transcontinental Insurance Co. (Transcontinental) appeals from the trial court's grant of summary judgment in favor of Meadow Valley Contractors, Inc. (Meadow Valley). The trial court ruling requires Transcontinental to provide insurance coverage, investigate, defend, and indemnify Meadow Valley for flood damage claims. We affirm.

## BACKGROUND[1]

¶ 2 Meadow Valley was the general contractor on a highway construction project extending from the I–15/I–215 merger to 2600 South in Woods Cross, Utah. Meadow Valley hired BT Gallegos Construction Company, Inc. (BT Gallegos) as a subcontractor to extend existing drainage lines and to tie those lines into an existing drainage system. As part of its project, BT Gallegos had to construct a concrete drainage box. To maintain a dry area for the construction, BT Gallegos diverted a stream of drainage water into a pre-existing drainage ditch by way of a diversion ditch. Neither the drainage ditch nor the diversion ditch were constructed by BT Gallegos. BT Gallegos expressed concerns about proceeding in the face of impending bad weather, but Meadow Valley instructed BT Gallegos to move forward with the work.

¶ 3 After diverting the water, BT Gallegos erected forms for the walls of the drainage box and poured concrete into the forms. The last concrete was poured on the afternoon of May 23, 1997. To allow the concrete time to set, the forms had to remain in place for twenty-four hours. While in place, the forms prevented water from flowing through the drainage box.

¶ 4 Heavy rain hit the construction site early the following morning, May 24, 1997. Upon arriving at the construction site that morning, a BT Gallegos foreman saw that water had overflowed the diversion and drainage ditches and was flowing into the parking lot of a nearby business. A Meadow Valley foreman was already at the construction site using a small trackhoe in an effort to stabilize the overflowing ditches. The BT Gallegos foreman tried to remove the forms on the drainage box, which would have allowed water to flow into the regular drainage system, but the extensive flooding prevented their removal.

¶ 5 After deciding that the small trackhoe was not big enough to stabilize the ditches,

1. "In reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Tretheway v. Miracle Mortgage, Inc.,* 2000 UT 12, ¶ 2, 995 P.2d 599.

the two foremen worked together to find a large backhoe. The BT Gallegos foreman suggested that they use the backhoe to tear out a metal pipe, which would allow water to flow into the regular drainage system. The Meadow Valley foreman had earlier decided not to remove the pipe because he did not want to ruin BT Gallegos's work. The BT Gallegos foreman persuaded the Meadow Valley foreman to remove the pipe, which eventually stopped the flooding. As a result of the flooding, however, several nearby businesses incurred damages. Those businesses submitted claims to Meadow Valley for reimbursement of expenses associated with the flooding.

¶ 6 The subcontract agreement between BT Gallegos and Meadow Valley required BT Gallegos to purchase an insurance policy with an endorsement naming Meadow Valley as an additional insured. BT Gallegos purchased a commercial general liability insurance policy, with the required endorsement, from Transcontinental. The endorsement extends insurance coverage to Meadow Valley with respect to "liability arising out of [BT Gallegos's] work." BT Gallegos's "work" is defined by the insurance policy as: "a. Work or operations performed by you or on your behalf; and b. Materials, parts[,] or equipment furnished in connection with such work or operations." [2]

¶ 7 Meadow Valley tendered defense of the flood damage claims to Transcontinental, claiming that the policy requires Transcontinental to provide insurance coverage, investigate, defend, and indemnify Meadow Valley. After Transcontinental refused the tenders of defense, Meadow Valley filed a lawsuit naming both Transcontinental and BT Gallegos as defendants. In its complaint, Meadow Valley asserted: 1) Transcontinental breached its duty under the policy to provide insurance coverage, investigate, defend, and indemnify Meadow Valley; and 2) BT Gallegos breached the subcontract agreement, which required BT Gallegos to indemnify Meadow Valley and to obtain an insurance policy that

covered Meadow Valley as an additional insured.

¶ 8 In response, Transcontinental and BT Gallegos filed an answer and counterclaim asserting that Meadow Valley's negligence caused the flooding and that neither the subcontract agreement nor the policy requires either Transcontinental or BT Gallegos to provide insurance coverage, investigate, defend, or indemnify Meadow Valley for its own negligence. Meadow Valley replied by asserting that BT Gallegos's defenses and claims against Meadow Valley were barred by BT Gallegos's own negligence and breach of contract.

¶ 9 On a motion by BT Gallegos and Transcontinental, the trial court, acting pursuant to Rule 21 of the Utah Rules of Civil Procedure, severed Meadow Valley's claims against Transcontinental from its claims against BT Gallegos. The trial court subsequently granted summary judgment in favor of Meadow Valley on its claims against Transcontinental and required Transcontinental to provide insurance coverage, investigate, defend, and indemnify Meadow Valley for the flood damage claims. This appeal followed.

## ISSUE AND STANDARD OF REVIEW

¶ 10 The sole issue on appeal is whether the trial court properly granted summary judgment in favor of Meadow Valley on its claims against Transcontinental. Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). " 'Because a challenge to summary judgment presents for review only questions of law, we accord no deference to the trial court's conclusions but review them for correctness.' " *Crossroads Plaza Ass'n v. Pratt*, 912 P.2d 961, 964 (Utah 1996) (citation omitted).

## ANALYSIS

### I. Interpretation of the Policy

¶ 11 This case involves interpretation of policy language that extends insurance cover-

---

**2.** Hereinafter, we collectively refer to the insurance policy and the additional insured endorse-  ment as "the policy."

age to Meadow Valley with respect to "liability arising out of [BT Gallegos's] work." Citing case law from Texas, Transcontinental contends that the phrase "arising out of" unambiguously provides coverage only for damages caused by BT Gallegos. *See Granite Constr. Co., Inc. v. Bituminous Ins. Co.,* 832 S.W.2d 427, 430 (Tex.App.1992). *But see Admiral Ins. Co. v. Trident NGL, Inc.,* 988 S.W.2d 451, 454–55 (Tex.App.1999) (following majority rule that the phrase "arising out of" does not limit coverage to accidents caused by the named insured). Because the issue of who caused the flooding is disputed in this case, Transcontinental first argues that genuine issues of material fact preclude summary judgment. Transcontinental alternatively argues that the facts, when viewed in the light most favorable to Transcontinental, show that the flood damage was caused by Meadow Valley's negligence and/or inadequate drainage ditches, which were not constructed by BT Gallegos. Thus, Transcontinental contends Meadow Valley is not covered under the policy because BT Gallegos did not cause the flood damage.

¶ 12 In granting summary judgment, the trial court agreed with Meadow Valley's argument that the "policy does not require a determination of negligence or an assessment of fault" because "the term 'arising out of' is not synonymous with the idea of causation or negligence." Citing case law from other states and federal courts, Meadow Valley contends that the term "arising out of" unambiguously means " 'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from.' " *Toll Bridge Auth. v. Aetna Ins. Co.,* 54 Wash.App. 400, 773 P.2d 906, 908 (1989) (citation omitted); *see also McIntosh v. Scottsdale Ins. Co.,* 992 F.2d 251, 255 (10th Cir.1993) (interpreting the phrase "arising out of" as requiring less than proximate cause). Meadow Valley argues that it is covered under the policy because the diverted water, which ultimately caused the damage, originated from the BT Gallegos project. Meadow Valley further argues that since the policy does not implicate causation or fault, no issues of material fact preclude summary judgment.

¶ 13 "An insurance policy is merely a contract between the insured and the insurer and is construed pursuant to the same rules applied to ordinary contracts." *Alf v. State Farm Fire & Cas. Co.,* 850 P.2d 1272, 1274 (Utah 1993). Furthermore, "[i]f a policy is ambiguous, doubt is resolved against the insurer." *Id.* "However, if a policy is not ambiguous, no presumption in favor of the insured arises and the policy language is construed according to its usual and ordinary meaning." *Id.* Finally, questions of contract interpretation are questions of law; therefore, we accord no deference to the trial court's interpretation. *See Zions First Nat'l Bank v. National Am. Title Ins. Co.,* 749 P.2d 651, 653 (Utah 1988).

¶ 14 Both parties in this case argue that the policy language is unambiguous, and we agree. Hence, we resort only to the ordinary meaning of the phrase "arising out of" to interpret the policy provision. Established Utah law provides:

> "[T]he term 'arising out of' is ordinarily understood to mean originating from, incident to, or in connection with the item in question."
>
> " . . . As used in a liability insurance policy, the words 'arising out of' are very broad, general and comprehensive. They are commonly understood to mean originating from, growing out of, or flowing from, and require only that there be some causal relationship between the injury and the risk for which coverage is provided."

*Viking Ins. Co. of Wisconsin v. Coleman,* 927 P.2d 661, 663 (Utah Ct.App.1996) (quoting *National Farmers Union Prop. & Cas. Co. v. Western Cas. & Sur. Co.,* 577 P.2d 961, 963 (Utah 1978) (citations and internal quotations omitted)). Thus, while some nexus must exist between the flood damage and the BT Gallegos project, the phrase "arising out of" does not require that BT Gallegos cause the damage. *See National Farmers,* 577 P.2d at 963 (stating "[t]he phrase 'arising out of' is equated with origination, growth, or flow from the event" and has "much broader significance than 'caused by' " (citation and internal quotations omitted)).

¶ 15 Here, a nexus exists between the BT Gallegos project and the flood damage.

The drainage box construction required diversion of the existing stream of water. The diversion of water led to the flooding because the diversion and drainage ditches were inadequate to handle the increased water flow created by the storm. Thus, the flooding "originat[ed] from, [was] incident to, [and was] in connection with" the BT Gallegos project. *Viking Ins. Co.*, 927 P.2d at 663 (citations and internal quotations omitted). The trial court therefore correctly concluded that the policy requires Transcontinental to provide insurance coverage, investigate, defend, and indemnify Meadow Valley for the flood damage claims.

## II. Application of Section 13–8–1 of the Utah Code

■ ¶ 16 Our analysis does not end with a determination that the policy requires Transcontinental to provide coverage. Transcontinental also argues that BT Gallegos "was statutorily prohibited from purchasing any sort of insurance policy which would insure Meadow Valley for Meadow Valley's own negligence." Section 13–8–1(2) of the Utah Code provides: "Except as provided in Subsection (3), an indemnification provision in a construction contract is against public policy and is void and unenforceable." Utah Code Ann. § 13–8–1(2) (1999). The issue, then, is whether the insurance provision of the subcontract agreement constitutes an unenforceable indemnification provision.

■ ¶ 17 "When faced with a question of statutory construction, we look first to the plain language of the statute." *C.T. v. Johnson*, 1999 UT 35, ¶ 9, 977 P.2d 479 (citation and internal quotations omitted). "We presume that the legislature used each word advisedly and give effect to each term according to its ordinary and accepted meaning." *Id.* (citation and internal quotations omitted). Here, the legislature explicitly defined "indemnification provision" as follows:

[A] covenant, promise, agreement or understanding in, in connection with, or collateral to a construction contract requiring the promisor to insure, hold harmless, indemnify, or defend the promisee or others against liability if:

(i) the damages arise out of:

(A) bodily injury to a person;

(B) damage to property; or

(C) economic loss; and

(ii) the damages are caused by or resulting from the fault of the promisee, indemnitee, others, or their agents or employees.

Utah Code Ann. § 13–8–1(1)(b) (1999).

¶ 18 Transcontinental focuses on the phrase "agreement ... requiring the promisor to insure" and argues that section 13–8–1 voids any agreement requiring one party in a construction contract to purchase insurance that covers liability stemming from the other party's negligence. *Id.* We disagree with Transcontinental's interpretation and conclude that the plain meaning of the statute voids only agreements requiring one party in a construction contract to personally insure against liability stemming from the other party's negligence. *See Zettel v. Paschen Contractors*, 100 Ill.App.3d 614, 56 Ill.Dec. 109, 427 N.E.2d 189, 191 (1981) ("An agreement to obtain insurance is not an agreement of insurance; a person promising to obtain insurance does not by that promise become an insurer ...."); *cf. Pickhover v. Smith's Mgmt. Corp.*, 771 P.2d 664, 669 (Utah 1989) ("An agreement to purchase insurance does not make the party agreeing to provide the insurance an indemnitor."); *Brzeczek v. Standard Oil Co.*, 4 Ohio App.3d 209, 447 N.E.2d 760, 764 (1982) (concluding that agreement to procure insurance is not against public policy because parties were not trying to exempt themselves from liability, but merely allocating the cost of procuring insurance from a third party).

¶ 19 In this case, the insurance provision of the subcontract agreement requires BT Gallegos to procure insurance and to name Meadow Valley as an additional insured. The provision does not, however, require BT Gallegos to personally insure or indemnify Meadow Valley for liability arising out of Meadow Valley's own negligence. Therefore, the insurance provision of the subcontract agreement does not violate section 13–8–1.

### CONCLUSION

¶ 20 The trial court correctly ruled that the policy requires Transcontinental to provide coverage, investigate, defend, and indemnify Meadow Valley. Furthermore, section 13–8–1 does not prohibit BT Gallegos from purchasing insurance that will insure Meadow Valley for its own negligence.

¶ 21 Accordingly, we affirm.

¶ 22 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge and JAMES Z. DAVIS, Judge.